**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **INSPIRED BAHAMAS PROPERTY, LTD.,** | * | |
| *Plaintiff,* | * | |
| v. | * | Case No. 1:23-cv-00243-JMC |
| **WORLDWIDE SPORTS SURFACES, LLC, et al.,** | * | |
| *Defendants.* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff, Inspired Bahamas Property, LTD. ("Inspired Bahamas"), filed the present lawsuit against Defendants Worldwide Sports Surfaces, LLC, ("Worldwide"), Lester J. Belcher III ("Belcher III"), Sunny Acres Landscaping, Inc. ("Sunny Acres"), and Lester J. Belcher, Jr. ("Belcher Jr.") on January 30, 2023. (ECF No. 1). Plaintiff filed an Amended Complaint on February 20, 2023, which is the operative complaint. (ECF No. 50). Plaintiff asserts five counts against Defendants: (1) breach of contract against Worldwide (Count I); (2) tortious interference with contract against Belcher III, Belcher Jr., and Sunny Acres (Count II); (3) promissory fraud against Belcher III (Count III); (4) unjust enrichment against Sunny Acres (Count IV); and (5) unjust enrichment against Belcher Jr. (Count V). *Id.* at 10-14.[1] Currently pending before the Court is Plaintiff's Motion for Summary Judgment, (ECF No. 77), and a Cross-Motion for Summary Judgment filed by Defendants Sunny Acres and Belcher Jr. (ECF No. 80). The motions have been fully briefed, (ECF No. 80; ECF No. 81; ECF No. 84), and no hearing is necessary. *See* Loc. R.

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. Where a document is not electronically stamped, the citation is instead to the number at the bottom of the page.

105.6 (D. Md. 2023). For the reasons set forth herein, Plaintiff's Motion for Summary Judgment (ECF No. 77) shall be GRANTED in part and DENIED in part. The Cross-Motion for Summary Judgment filed by Sunny Acres and Belcher Jr., (ECF No. 80), shall be GRANTED.

## I.    BACKGROUND

### a.    <u>Factual Background</u>[2]

This matter arises from a contract between Inspired Bahamas and Worldwide for the construction of athletic fields at the Kings College School in the Bahamas. Kings College School is "owned and operated by Inspired Bahamas as part of Inspired Education, which is an international education group with over 110 schools across six continents." (ECF No. 77-1 at 7). Worldwide is an LLC owned by Amicus Partners, LP ("Amicus"). (ECF No. 77-4 at 6). Belcher III is the sole partner of Amicus, and the only managing member of Worldwide. *Id.* Worldwide has never had any employees, and Belcher III is the sole person to have ever performed executive functions on its behalf. *Id.* at 9. Originally, Belcher III planned to run Worldwide with Sebastian Veilleux and Jerry Harper, with Worldwide obtaining construction contracts and subcontracting to Sunny Acres and Constructions Pro Gite, d/b/a Hera Sports Surfaces ("Hera"). *Id.* at 10. Veilleux is the president and owner of Hera. (ECF No. 77-43). Sunny Acres is a construction company which performs grading and excavation of athletic fields, and is owned by the Lester J. Belcher Jr. Revocable Trust, for which Belcher Jr. and Belcher III (Belcher Jr.'s son) serve as trustees. (ECF No. 77-1 at 8). Belcher Jr. is the president and treasurer of Sunny Acres, and Belcher III serves as vice president. *Id.*

---

[2] The following facts are undisputed, unless specifically noted, or otherwise characterized as being the position of one of the parties.

Inspired and Worldwide entered into a contract in April 2022 for "the construction of several fields and the installation of synthetic turf and running track" at Kings College, an educational and recreational facility, that Inspired planned to open in the Bahamas for the 2022-2023 school year. (ECF No. 77-1 at 8). Specifically, Worldwide was contracted to provide: "(1) the base construction and the installation of concrete curbing for a five-a-side soccer field, a sports and events field, and two play areas; (2) the installation of pads, synthetic turf, infill and inlay on the fields; and (3) providing and installing a running track." *Id.* at 8-9. The total contract price was $667,920.00, with payment to be made over five installments, with 35% at the time of the contract's execution, 25% upon mobilization, 15% upon completion of base construction, 15% upon completion of turf installation, and the last 10% when the final punch list was completed. *Id.*; ECF No. 81 at 3. The first payment of $233,752.00 was transferred to Worldwide on April 8, 2022. *Id.* Worldwide subcontracted the turf and track installation to Hera, and, according to Worldwide, subcontracted the base construction and curbing of the soccer field to Sunny Acres.[3]

Worldwide explains that in July 2022, a Sunny Acres landscaping crew arrived in the Bahamas to begin working. (ECF No. 81 at 3). They "put stone in the middle of the field" but could not complete the curbing because drainpipe installation (which a different contractor, Osprey Construction ("Osprey") was responsible for) had not yet occurred. *Id.*; ECF No. 77-1 at 11. The Sunny Acres crew then departed from the Bahamas at the end of July once their work permits expired, while Osprey installed the drainage system. *Id.* Defendants attach multiple email chains documenting Osprey's delay in installing the drainage system between July 7, 2022 and August 8, 2022. (ECF No. 80-12).

---

[3] Inspired contends there are questions of fact as to whether Sunny Acres personnel completed work on the facilities and note that there is no subcontract agreement with Sunny Acres—only a purchase order and invoice which was never transmitted between Worldwide and Sunny Acres. (ECF No. 81 at 15).

At some point thereafter, Belcher III and the Sunny Acres crew returned to the Bahamas.[4] Inspired transferred the second installment due under the contract in the amount of $166,980 to Worldwide on July 26, 2022. (ECF No. 77-9 at 21). On August 2, 2022, Belcher III transferred $100,000 from the Worldwide account to a savings account held solely in Belcher Jr.'s name. *Id.* Belcher Jr. had not personally done any work on the Kings College project. *Id.* Belcher Jr. maintains that he uses the referenced account for both personal and business purposes,[5] while Inspired contends that it is a purely personal savings account. *Id.*; ECF No. 81 at 4. On September 2, 2022, Belcher Jr. transferred $43,000 back to Worldwide. (ECF No. 80-10 at 10).

On August 8, 2022, Belcher III sent an email indicating that Worldwide could not proceed with the curbing on the soccer field until Osprey completed the drainage system and advised he was "coordinating a subcontractor to install the curb." (ECF No. 77-17 at 2). Two days later, Peter McLeod, the quantity surveyor and project manager, emailed Belcher III to inquire when his curbing crew would arrive, as the site was ready for Worldwide to begin installation. ECF No. 77-18 at 4. Belcher III responded he would "make the arrangements and be in touch with the group" later that same day. *Id.* at 6.

The next day, when no further response was received, McLeod followed up with Belcher III by email, noting that no Worldwide personnel were on site. (ECF No. 77-19). Inspired employee Antonio Neto also replied to the email thread, stating that Worldwide's workers were "nowhere to be seen" and stressing that the project was a matter of urgency given that the school opened in two weeks. *Id.* Belcher III responded that he had "made arrangements for a concrete curb to start next week." *Id.* However, Belcher III testified in his deposition that he never secured

---

[4] The Court is not clear on precisely when this occurred.
[5] For example, Belcher Jr. notes that on July 27, 2022, he deposited $20,000 from the account to a Sunny Acres payroll account to cover payroll. (ECF No. 84 at 5).

a curbing subcontractor. (ECF No. 77-5 at 5) ("Q: So when you say we have made arrangements to subcontract the curbing, that's not correct, is it? A: We had made arrangements or we were making arrangements, and then, eventually, Inspired did it."). Per an email sent by Neto referencing a phone call with Belcher III, Belcher III assured Inspired that curbing would take only three to four dates to complete. (ECF No. 77-20).[6] Inspired ultimately engaged High-Rise Concrete Construction ("HCC") to complete the curbing and directly paid HCC $26,426.40. (ECF No. 77-37 at 2).

On August 15, 2022, Nadim Nsouli, the founder and CEO of Inspired, emailed Belcher III to express his concerns that despite being scheduled to start the curbing that day, Belcher III was nowhere to be found. (ECF No. 77-24 at 3). Nsouli further indicated that failure to have the field ready for the start of the school year would "lead to significant reputational and consequential damages" and asked that Belcher III contact him with an action plan as soon as possible. *Id.* Neto also followed up by email, stating that no one from Worldwide was on site and that he was unable to reach Belcher III by phone. *Id.* On August 16, 2022, Neto informed Belcher III that Inspired had engaged a contractor to carry out the curbing, and requested confirmation that Worldwide would be ready start installing turf once the curbing was completed. *Id.* Belcher III responded, "[t]hat's good news" but did not address turf installation. *Id.*

Later that same day, Belcher III emailed Neto and Nsouli again, attributing challenges to Worldwide's schedule and workforce to the 2-month delay caused by Osprey and further stated: "Your project is important to Worldwide Sports Surfaces and I'm sure it will do everything in their power to complete this project in a timely manner. Please understand that we required 5 weeks to

---

[6] Belcher III testified at deposition that after the curbing was completed, his crew was required to fine grade the field and achieve planarity prior to turf installation, which is a week to ten days' worth of work after the curb is complete. Sep. 17, 2025 Belcher III Dep. Tr. at 298:2-11.

complete the project and it was not made available to us until Tuesday August 9." (ECF No. 77-25 at 3). Neto responded that Belcher III "told [Neto] on Friday the kerbing [sic] [would] be done by the end of this week and the turf another two weeks," asked Belcher III what had changed to cause the shift in the schedule, and requested that turfing be expedited. *Id.* When Nsouli sent an additional email requesting confirmation that Worldwide would handle the turfing, Belcher III advised they should direct all further communications to Vellieux, as Belcher III was "moving on from Worldwide Sports Surfaces and Sebastian is the point of contact moving forward." *Id.* at 2. Belcher III testified that at the time he sent the email, he was Worldwide's sole employee, he had not had any conversations with Vellieux regarding taking over oversight of the Kings College project,[7] and Vellieux did not have access to Worldwide's bank accounts. (ECF No. 77-13 at 8-9).[8] Further, Belcher III continued to transact business on behalf of Worldwide—Worldwide engaged Hera to take over the remaining track and turf installation, and on September 2, 2022, Belcher III approved a Hera proposal (sent by Vellieux) in the amount of $348,920.00. (ECF No. 77-43 at 3).

In an email chain dated September 5 through September 7, 2022, Belcher III represented that he was no longer in the Bahamas and would not be returning. (ECF No. 77-26 at 2). Although he was no longer on site, Belcher III sent an email on September 9, 2022 indicating that base construction had been completed the prior evening and turf installation could begin. (ECF No. 77-27 at 4). He noted that "Osprey and its subcontractors were finishing up a few items on the field"

---

[7] Belcher III clarifies that he told Vellieux that Vellieux could take over running Worldwide during an argument, but did not have conversations specifically regarding the transfer of the Kings College Project. (ECF No. 77-13 at 9) ("Q:…[H]ad you discussed with Sebastien either him or Hera taking over the remaining work? A: Kind of. It was more of a – he had done some cheating, basically. He took some jobs that were in – that were for Worldwide to do and put them in Hera's name and then was using Worldwide resources to start those jobs. And I kind of lost my temper and told him he could basically take it, and that was at that time, so…").

[8] Exhibit 10 to Plaintiff's Motion for Summary Judgment is Belcher III's deposition in his capacity as the corporate designee for Worldwide, Sunny Acres, and Amicus Partners. (ECF No. 77-13).

and should touch up their disturbances, specifically (1) a small area at the entrance, (2) an area at the end of the field near the wall, (3) a path used across the field to deliver the stone to the trench they cut/repaired, and (4) at the trenches Osprey repaired at both ends of the field. *Id.*[9] Hera's turf installers informed Inspired that the field was not ready for turf installation because it was a "mess" and had wavy edges which were not compacted. *Id.*

Nsouli accordingly emailed Belcher III, notifying him the field was not ready for turf installation and that Inspired would "retain another firm to do the grading and pursue [Worldwide] for that cost as well as the cost of the curbing[.]" *Id.* Belcher III responded that, per the installer's "man on the site," the referenced issues on the field were caused by Osprey. *Id.* He further indicated that it would be best for Inspired to have others complete the project, stating: "We find it impossible to work around your delays and constant interference." *Id.* Belcher III was no longer in the Bahamas by that time, but, as will be discussed in detail later, he took photos of the field in question on September 3rd about which he testified the field grading was completed. (ECF No. 77-13 at 11, 13). In contrast to Belcher III's characterization of the September 3rd photos, Vellieux was on site by September 9th to perform the turf installation, and Inspired attaches a declaration to its motion in which Vellieux attests the grading was defective, with spots as low as three inches below the level needed for final grading, and "the defects were present throughout the field and were not isolated to the areas at either end of the field near the drainage pipes[,]" where Osprey was working by that time. (ECF No. 77-43 at 2).

Inspired thereafter engaged Bahamas Hot Mix ("BHM") to grade the soccer field and correct the aforementioned defects, paying BHM a total sum of $49,044.28. (ECF No. 77-37 at 2).

---

[9] The Court infers that at least some of the work completed by Osprey at this time related to the issues with Osprey's drainage pipe installation Belcher III identified in September 7-9, 2022 email correspondence. (ECF No. 77-26 at 2).

Inspired additionally hired Commercial Construction & Management ("CCM") and directly contracted with Hera to complete the work under the contract with Worldwide, paying them each $63,786.00 and $287,667.00, respectively. *Id.* at 3. Inspired ultimately paid a total of $827,665.67 to Worldwide, HCC, BHM, CCM, and Hera to complete the work outlined in the contract with Worldwide. *Id.*

### b.  <u>Procedural History</u>

Inspired Bahamas initiated the present action on January 30, 2023. (ECF No. 1). Worldwide filed an Answer to Inspired Bahamas' Complaint on March 8, 2023, asserting a counterclaim for breach of contract against Inspired Bahamas in the same filing. (ECF No. 21 at 12). On February 20, 2024, Inspired Bahamas filed an Amended Complaint, which is now the operative complaint in this matter. Inspired Bahamas asserts five counts against Defendants: (1) breach of contract against Worldwide (Count I); (2) tortious interference with contract against Belcher III, Belcher Jr., and Sunny Acres (Count II); (3) promissory fraud against Belcher III (Count III); (4) unjust enrichment against Sunny Acres (Count IV); and (5) unjust enrichment against Belcher Jr. (Count V). (ECF No. 50 at 10-14). When Worldwide answered the Amended Complaint, it did not reassert its breach of contract counterclaim. (ECF No. 53). Currently pending before the Court is Inspired Bahamas' Motion for Summary Judgment, (ECF No. 77), and Defendants Belcher Jr. and Sunny Acres' Cross-Motion for Summary Judgment. (ECF No. 80).

Inspired Bahamas seeks summary judgment with respect to Count I (breach of contract against Worldwide) and Count V (unjust enrichment against Belcher Jr.) of its Amended Complaint, and dismissal of Worldwide's counterclaim. (ECF No. 77-1 at 6). Sunny Acres moves for summary judgment on Count VI of Inspired Bahamas' Amended Complaint (unjust enrichment

against Sunny Acres), while Belcher Jr. moves for summary judgment on Count V (unjust enrichment against Belcher Jr.). (ECF No. 80-1 at 9-13).

In reviewing the parties' filings, the Court identified a choice of law clause in the contract between Inspired Bahamas and Worldwide, which provides that the contract "shall be governed by the Laws of Commonwealth of the Bahamas." (ECF No. 77-8 at 11). Noting that the parties cite Maryland contract law in their summary judgment memoranda, the Court directed the parties to provide briefing on the issues of whether (1) the choice of law provision set forth in § 15.3 of the contract should be enforced; (2) if the choice of law provision is enforced, what differences exist between Maryland and Bahamian contract law; and (3) whether those differences require the parties to submit supplemental, or even new, summary judgment memoranda. (ECF No. 85). Plaintiff submitted it's brief on April 4, 2025, (ECF No. 86), and Defendants' brief was filed on April 14, 2025. (ECF No. 87). The Court additionally requested counsel provide complete copies of Belcher III's deposition transcripts, including his Rule 30(b)(6) deposition, and considered them in deciding the parties' motions for summary judgment.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"

9

*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 288, 230 (1st Cir. 1996)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

## III.  ANALYSIS

### a.  Maryland Contract Law Controls in this Diversity Action

As discussed previously, when reviewing the contract between Inspired and Worldwide the Court noted a choice of law provision designating Bahamian law to govern any disputes arising from the contract. (ECF No. 77-8 at 11). The parties, however, relied upon Maryland contract law in their summary judgment motions. The undersigned therefore directed the parties to submit

supplemental briefs addressing whether the choice of law provision should be enforced and if there existed any differences between Bahamian and Maryland contract law which might require further dispositive motions briefing. (ECF No. 85).   The parties agree that Maryland and Bahamian contract law are substantially similar for the purposes of deciding the pending motions. They share the same elements for establishing a breach of contract and measure construction contract damages in the same way. (ECF No. 86 at 3-4; ECF No. 87 at 3). Accordingly, because there is no true conflict of law present, the Court need not make a choice of law determination. *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4th 263, 271-72 (4th Cir. 2022) ("Generally, 'when the resolution of a choice-of-law-determination would not alter the disposition of a legal question, a reviewing court need not decide which body of law controls.'") (quoting *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 158 (1st Cir. 2005)); *see also World Fuel Servs. Trading, DMCC v. Heibei Prince Shipping Co., Ltd.*, 783 F.3d 507, 514-15 (4th Cir. 2015).

Moreover, the parties both exclusively cite Maryland contract law in their briefs and advocate for the Court to apply Maryland law in adjudicating their motions, regardless of the choice of law provision set forth in the contract. (ECF No. 85; ECF No. 86). The Court will therefore "follow the Fourth Circuit's lead and respect the wills of the parties as to the choice(s) of law[.]" *Finch v. Lowe's Home Ctrs., LLC*, No. 2021 WL 2982863, at *10 n.1 (D.S.C. July 15, 2021) (citing *Chorley Enter., Inc. v. Dickey's Barbeque Rest., Inc.*, 807 F.3d 553, 563 n.11 (4th Cir. 2015)); *Chorley Enter., Inc.*, 807 F.3d at 563 n. 11 (applying Maryland law despite choice of law provision designating Texas law as governing action, where parties agreed that Maryland law applied and cited to Maryland law in briefings). Maryland contract law will govern this matter.

### b.  Inspired is Entitled to Partial Summary Judgment on its Breach of Contract Claim Against Worldwide

Under Maryland law, the elements of a breach of contract claim are (1) a contractual obligation; (2) breach of that obligation; and (3) damages. *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 596 (D. Md. 2019) (quoting *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (citations omitted)). Inspired contends Worldwide breached multiple provisions of their contract, including: failure to visit the site prior to execution of the contract; failing to secure liability insurance; failing to inform Inspired of the names of its subcontractors and suppliers; failing to pay its subcontractors; failing to provide adequate labor, materials and equipment sufficient to complete its scope of work; failing  to adequately supervise and direct the work; and failing to complete the full scope of the work under the contract, including the installation of the curb on the soccer field, the installation of the running track, and the entirety of the sports and events field. (ECF No. 81 at 6). Of these purported breaches, however, only some contributed to Inspired eventually hiring another contractor to complete the work under the contract—Inspired refers to these breaches as being "particularly material" and explains, for example, that because Worldwide did not secure labor necessary to install curbs for the soccer field in August, Inspired had to engage HCC to complete the curbing and pay HCC directly. *Id.* Other alleged breaches, such as Worldwide failing to visit the build site in advance of the contract, or failing to secure liability insurance, do not appear to directly connect to the damages Inspired seeks. The Court will therefore focus its analysis on alleged breaches which Inspired maintains caused it to engage third parties to complete the scope of the work under the contract. The Court will separately address the curbing completed by HCC in August, before turning to the work occurring after September 10, 2022.

### i.  <u>Curbing</u>

Under the terms of the contract between Worldwide and Inspired, Worldwide was obligated to construct a soccer field for Kings College, to include 6-inch by 12-inch curbing. (ECF No. 77-8 at 4). It is undisputed that Worldwide did not hire a subcontractor to complete the necessary curbing on the field, and that Inspired ultimately engaged HCC to perform the work under the contract. (ECF No. 77-5 at 5) ("Q: So when you say we have made arrangements to subcontract the curbing, that's not correct, is it? A: We had made arrangements or we were making arrangements, and then, eventually, Inspired did it."). It is also undisputed that Inspired directly paid HCC $26,426.40 for the curbing, despite it being within the scope of the original contract. (ECF No. 77-37 at 2). Belcher III concedes these points in his deposition, agreeing that Worldwide should have credited Inspired for the payment to HCC:

> Q: …Was a subcontractor hired to perform the concrete work?
>
> A: It was. Peter had suggested that why didn't he just hire [HCC] to do it and could back-charge their contract, so that's – that was the easiest way to do it at that point.
>
> Q: Who paid [HCC]?
>
> A: Inspired.
>
> …
>
> Q: But the work [HCC] did that's being discussed here, that work was part of the scope of Worldwide's work in the contract, right?
>
> A: The concrete was, yes.
>
> Q: Okay. And was there a credit for that portion of the work that was issued to Inspired?
>
> A: We never got that far. There should have been, yes, but we never got that far.
>
> Q: So Worldwide should have credited or paid funds to Inspired for the cost of the work that [HCC] did that's being referred to here, correct?
>
> A: It should have been deducted from the monies – from the contract sum due or paid – paid or due, yeah.

(ECF No. 77-4 at 41-42).[10]

The Court has no difficulty concluding there is no genuine dispute that Worldwide had a contractual obligation to complete the curbing on the soccer field, Worldwide breached its duty by failing to secure a subcontractor to complete the work, and Inspired incurred damages in the amount of $26,426.40.[11] (ECF No. 77-37 at 2). Thus, Inspired is entitled to summary judgment as a matter of law with respect to Worldwide's failure to complete the soccer field's curbing.

Pursuant to the parties' contract, "[i]f the unpaid balance of the Contract Sum exceeds costs of finishing the Work, such excess shall be paid to the Contractor. If such costs exceed the unpaid balance, the Contractor shall pay the difference to the owner." (ECF No. 77-8 at 12). This provision is consistent with Maryland law, under which the primary measure of damages in a breach of contract action stemming from a construction contract, "is the cost of repairing or remedying the defect." *In re Cranston*, 387 B.R. 480, 485 (D. Md. 2008) (citing *Hall v. Lovell Regency Homes Ltd. P'Ship, et al.,* 121 Md. App. 1, 12 (1998)) ("The amount of damages recoverable for a breach of contract is that which will place the injured party in the monetary position he would have occupied if the contract had been properly performed."). Accordingly, because Inspired paid $26,426.40 over the contracted price with Worldwide to complete the curbing work, Inspired shall be awarded $26,426.40 in damages.[12]

---

[10] Belcher III refers to BHM as the contractor who eventually completed the curbing in his deposition, whereas a declaration prepared by Peter McLeod (the quantity surveyor and contract manager hired for the Kings College Project) indicates the work was done by HCC. (ECF No. 77-37 at 1-2). It appears to the Court that Belcher III was merely misinformed regarding the name of the company hired. References to BHM in Belcher III's deposition have therefore been corrected to HCC so as to minimize confusion for the reader.

[11] This amount is uncontested by Defendants.

[12] Inspired requests the Court additionally order Worldwide to pay prejudgment interest but provides no legal argument as to why prejudgment interest is proper. (ECF No. 77-1 at 7; ECF No. ECF No. 81 at 16). Under Maryland law, "[p]rejudgment interest *must* be granted where 'the obligation to pay and the amount due' were 'certain, definite, and liquidated by a specific date prior to judgment'" and "*may* be granted, but is not required, in the remaining 'broad category of contract cases.'" *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 311 (4th

### ii.  <u>Turf Installation & Remaining Work Under the Contract</u>

Inspired next argues Worldwide breached the contract by failing to properly grade the soccer field and refusing to correct the grading deficiencies, instead abandoning the project completely and "forcing Inspired to terminate the contract for cause." (ECF No. 77-1 at 7). Worldwide counters that any defects in the field's grading were caused by Osprey, maintaining the grading was finalized as of September 9, 2022, when Belcher III emailed Inspired to inform them base construction was completed the evening prior and turf installation could begin. (ECF No. 77-27 at 4). Neither party disputes that Worldwide was obligated under the contract to provide base construction for the soccer field, which included level grading. Further, there exists no genuine issue that the field *was* defective on September 9, 2022—Vellieux was on site and attests that the grading was defective, with spots as low as three inches below the level needed for final grading. (ECF No. 77-43 at 2). By that time Belcher III was no longer in the Bahamas and has no personal knowledge to contradict Vellieux's description of the field as of September 9th.[13] Moreover, it is undisputed that Inspired hired BHM to perform emergency grading of the field, which presumably would not have been necessary if the field was properly graded. (ECF No. 77-37 at 2). However, based on a review of the exhibits provided and the full deposition transcripts of Belcher III, the Court concludes there exists a genuine issue of fact as to whether Osprey damaged the field. As will be explained, this issue is material to whether Worldwide breached its contract with Inspired.

---

Cir. 2020) (citations omitted). The Court has no record upon which to determine whether the prejudgment interest sought falls into either category, and therefore declines to order it.

[13] Belcher III testified he spoke with someone on the ground from Hera, who attributed the damage to Osprey, but cannot remember the name of the person he spoke with. (ECF No. 77-13 at 10).

Belcher III has consistently represented that any defects in the field's grading were caused by Osprey. In his September 9, 2022 email to Inspired's team in which he reported the grading was complete, he also noted there were several areas of the field which Osprey had disturbed and needed to "touch up," including (1) a small area at the entrance; (2) near the end of the field; (3) along a path Osprey used across the field to deliver stone to the trench they repaired; and (4) along trenches they repaired at both ends of the field. (ECF No. 77-27 at 4). He testified at deposition:

> Q: Ok. [Sebastien Vellieux] goes on to write, "The field has 3 inches low spots. It was not good." Do you see that?
>
> A: Yes.
>
> Q: Do you know what Sebastian's referring to there?
>
> A: Probably the – yeah, the things that Osprey had screwed up.
>
> Q: By September 10th, had Worldwide completed the final base construction?
>
> A: September 9th is when we finished the base construction.
>
> Q: So, regardless of what Osprey did, if Worldwide finished the base construction on September 9th, why on September 10th is Sebastien saying there are 3-inch low spots?
>
> A: Because Osprey was there doing the work while we were finishing up. They were there simultaneous with us, screwing up both ends of the field and traveling across the field and …
>
> Q: So are you claiming that by September 9th, Worldwide had gotten the field to a quarter-inch planarity, but then Osprey created 3-inch low spots after that?
>
> A: I don't know about the 3-inch low spots. That's Sebastien saying that. I'm saying the field on September 9th was 100 percent complete except what Osprey was doing.
>
> Q: Was Osprey doing work on the field?
>
> A: Yes.
>
> Q: What work?
>
> A: They were installing end drains at each end of the field. So they dug up our whole – they dug up the whole end of each field.

(ECF No. 77-5 at 8). When asked if he documented the state of the field on September 9, 2022,

Belcher III refers to the September 9th email referenced previously. *Id.*; ECF No. 77-27 at 4.

Belcher III then testified to having personally taken photographs of the work site:

> Q: Turning to the third page of this exhibit, this is your e-mail, and you write, "Osprey and its subcontractors were finishing up a few items on the field. They should plan to touch up their disturbance." And then you list a few areas. Do you see that?
>
> A: Uh-huh.
>
> Q: Did Sunny Acres personnel take any photographs of the site at that point?
>
> A: Yes.
>
> Q: Were those photographs sent to anyone?
>
> A: They're part of – they were on my phone[…]

*Id.* Plaintiff's counsel went on to show Belcher III several photographs which appear to be the

photos referenced:

> Q: … Turning to Worldwide Sports 156, can you tell us what this picture shows?
>
> A: Yeah. That's – the last one and this one are when Osprey was digging up the ends of our field after we already had it fine graded, after we already have – we're done. We're finishing up that day. So this is probably on the 10th of September.
>
> Q: Okay so –
>
> A: But that's their equipment digging up the end of the field.
>
> Q: So we're talking about Worldwide Sports 155 and Worldwide Sports 156. These were both taken when the fine grading was complete?
>
> A: Correct.
>
> Q: Okay. Looking as [sic] Worldwide Sports 157.
>
> A: Same thing.
>
> Q: Same thing as –
>
> A: Yeah.
>
> Q: --Worldwide Sports 156 and 55?
>
> A: Correct.

Q: Okay. Turning to the next page, this is Worldwide Sports 158. What does this picture show us?

A: A pile of dirt that Osprey put on top of our finish grade.

Q: So would this have also been from –

A: Or stone.

Q: –that–

A: Or stone. Yes, that is from that –

Q: So this would have been from September 9th or 10th?

A: Correct.

Q: And were you – so – you took these pictures personally?

A: I did. So it's – I think I was – I had left by the 9th or 10th, so it might have been a day or two ahead of that.

Q: … Turning back just one page to 157, were you taking this picture from a car?

A: Yes.

Q: Okay. And so did you drive the car onto the field?

A: Yes.

Q: Would that have been after the finish grade was complete?

A: Yes.

Q: Okay.

A: The finish grade is compacted like a road base, so you're not going to create divots with that. In fact, for – for them to say there's 3-inch low divots or – you know, that just doesn't happen, because it's compacted.

Q: So just – just so I understand, the finish grade, is that after you've spread the stone and achieved planarity? That's – like, you're completely done at that point?

A: Correct.

Q: Okay. And so would a tractor have disturbed the finished grade?

A: Yes. A tractor definitely would disturb the finish grade.

Q: And what – why would a tractor do that and not a car?

A: Well, you're talking about, on the tractor, you're – the type of tires. You have – the tread on it is totally different than a car, and when you turn, you're – it's – it's moving material when you turn, and they – so it definitely would – it would definitely do that. And then the skidsteer [sic] that they're carrying back and forth – they're carrying buckets back and forth of this material off that they're digging

18

> up, and they're bringing gravel back in. So any time that – that machine makes any
> kind of movement, it's displacing what we've done and spilling out of the bucket,
> I mean, just things spill as – as you go. So, I mean, they're just tearing it all up.

*Id.* at 11. Later in the deposition, Plaintiff's counsel asked Belcher III to confirm the dates of the

photos Worldwide produced by reviewing the original images on his phone. *Id.* at 12-13. Belcher

III determined that the photos of the site where the finish grade was completed were actually taken

on September 3rd, rather than on September 9th or 10th, as he initially believed. *Id.* Plaintiff's

counsel did not follow up to ask for clarification regarding this discrepancy, but did return to the

subject to confirm that Belcher sent an email on September 9th representing the base construction

was completed the evening before (on September 8th), that the latest photos Belcher III took of

the site were from September 3rd, and there were "no pictures showing the way the field looked

when the base construction was complete on September 8th, 2022[.]" Belcher III 30(b)(6) Dep.

Tr. at 172:7 – 173:6.

Inspired, meanwhile, contends that while Osprey was still performing work on the field

during the relevant timeframe, "Osprey's work at this point was isolated to digging up drains at

either end of the field." (ECF No. 77-1 at 20). Thus, Inspired argues, because defects were not

limited to the ends of the field where Osprey was working, Osprey could not be responsible for

the grading issues. *Id.* Vellieux's declaration is consistent with this theory. (ECF No. 77-43 at 2)

("Among the defects I observed were spots as much as three inches below the level needed for

final grading…These defects were present throughout the field and were not isolated to the areas

at either end of the field near the drainage pipes.").

The Court agrees that on this record, a reasonable juror might conclude Osprey did not

cause the damage, and Worldwide simply failed to deliver a properly graded field. However, it is

also possible that a reasonable juror could conclude Osprey damaged the field and Worldwide

adequately performed under the contract. Belcher III testified in detail to taking photos on September 3, 2022 in which grading was finalized. He further testified that Osprey's equipment on site (the "skid steer," a type of tractor) was capable of creating large divots in the field of the type Vellieux attested to. (ECF No. 77-5 at 11). He also described how the tractor moved in between the two ends of the field through its center, which is further corroborated in his September 9th email. *Id.*; (ECF No. 77-27 at 4) (referencing Osprey's "path used across the field to deliver the stone to the trench they cut/repaired."). While it is not clear to the Court why Belcher III would not have informed Inspired that grading was completed on September 3rd and instead waited until September 9th, this is a question best resolved by a factfinder. Accordingly, the Court concludes there is a genuine dispute of material fact as to whether Worldwide failed to finalize the grading, or if grading was completed, but subsequently damaged by Osprey.

Inspired alternatively argues that even if Osprey damaged the field, Worldwide was obligated to correct the deficiencies as a matter of law, and instead simply abandoned the project. (ECF No. 77-1 at 20). The Court finds, however, that there is a material dispute as to whether Worldwide abandoned the project in light of the parties' email correspondence on September 9th. After Belcher III emailed Inspired's employees to inform them the field grading was completed and turf installation could begin, Nsouli responded:

> Les according to the installers this is not in a state to install and hence we need to do the work against as you are in breach of contract[.]
>
> …
>
> Hence we will now retain another firm to do the grading and pursue you for that cost as well as the cost of the curbing that you didn't install and that we had to hire another firm to do.

(ECF No. 77-27 at 3). Belcher III then wrote back, "I think it would be best for you to have others complete the project." *Id.* Given that Nsouli informed Belcher III that Inspired would hire another

firm to complete the work, there remains a genuine dispute as to whether Worldwide abandoned the project as Inspired contends. *J.E. Dunn Const. Co.*, 115 F. Supp. 3d at 600 (citation omitted) (explaining a dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). Accordingly, because there exist genuine disputes as to (1) the source of the damage to the field; and (2) whether Worldwide should have remedied the defective field, summary judgment shall be denied.

### c.  Inspired's Unjust Enrichment Claims are Barred as a Matter of Law

Inspired moves for summary judgment on its unjust enrichment claim against Belcher Jr., while Belcher Jr. and Sunny Acres move for summary judgment on Inspired's unjust enrichment claims against each of them. Inspired contends Belcher Jr. was unjustly enriched by the $100,000 August 2, 2022 transfer from Worldwide to Belcher Jr.'s bank account, arguing the account is solely personal (as opposed to being a business account for Sunny Acres) and noting that Belcher Jr. did not personally perform any work on the Kings College project. (ECF No. 77-1 at 22-25). Inspired consequently seeks restitution damages in the amount of $100,000 against Belcher Jr. *Id.* at 25. Inspired additionally seeks restitution from Sunny Acres on the basis that Sunny Acres "improperly received Contract payments made to Worldwide by Inspired, as a result of the wrongful conduct of Belcher III, for use in unrelated Sunny Acres projects." (ECF No. 81 at 12). These contract payments are distinct from Worldwide's $100,000 transfer to Belcher Jr., and Inspired maintains there are genuine issues of material fact as to the benefits received by Sunny Acres which preclude summary judgment. *Id.* at 12-13.

Under Maryland law, an unjust enrichment claim consists of three elements: (1) "[a] benefit conferred upon the defendant by the plaintiff;" (2) "[a]n appreciation or knowledge by the defendant of the benefit;" and (3) "[t]he acceptance or retention by the defendant of the benefit

under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007) (quoting *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151-52 (2000)). Belcher Jr. contends he is entitled to summary judgment because Inspired essentially seeks to recover twice for the same injury. (ECF No. 80-1 at 9-13). He explains that because Inspired simultaneously pursues damages against Worldwide for breach of contract, and the unjust enrichment claims are predicated on transfers Worldwide made to Belcher Jr. using payments received under the contract with Inspired, the restitution damages are duplicative of the breach of contract damages. *Id.* Under Belcher Jr.'s theory, while the first two elements of unjust enrichment may be met (Worldwide conferring a benefit on Belcher Jr., and Belcher Jr. possessing appreciation or knowledge of the benefit), Belcher Jr.'s retention of the benefit is not unjust because Inspired may obtain relief via its breach of contract claim. *Id.*; *Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*, 249 Md. App. 307, 329 (2021). Thus, Worldwide cannot show the third element needed to establish unjust enrichment and its claim fails as a matter of law. The Court agrees.

Belcher Jr. relies on *Clark Office Building, LLC v. MCM Capital Partners, LLLP* in support of his position. *Id.*[14] In *Clark Office Building*, the owner of an office building brought a lawsuit against a tenant for non-payment of rent and breach of lease, as well as an unjust enrichment claim against occupants of the building. *Id.* at 311-13. The tenant had permitted the occupants, without the owner's knowledge or permission, to use the building in violation of the tenant's lease. *Id.* The owner successfully sued the tenant for breach of lease and non-payment, but the Maryland trial court held the owner could not recover restitution for the occupants' use of the premises because

---

[14] Although Sunny Acres does not explicitly raise this argument, the Court finds that it is also applicable to barring the unjust enrichment claim Inspired brings against it.

the lease covered the same subject matter. *Id.* at 313. Maryland's Appellate Court (then named the Court of Special Appeals) affirmed the trial court's ruling after extensive discussion of authority from Maryland and other jurisdictions, particularly relying upon the court's earlier ruling in *County Commissioners of Caroline County v. J. Roland Dashiell & Sons, Inc.*, ("*Dashiell*"), in which the court recognized that it is "settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties." *Id.* at 315-16 (quoting *Dashiell*, 358 Md. 83, 96 (2000) (citations omitted)). The *Clark Building* court applied this reasoning to bar the owner's unjust enrichment claim against the building occupants, although they were not parties to the lease, explaining:

> As the cases we have discussed establish, the principle in *Dashiell* does not necessarily bar a claim for unjust enrichment by a party to a contract against a stranger to the contract when the claim involves the same subject matter as the contract. However, *when the plaintiff has a viable breach of contract remedy against the contracting party for the same recovery it seeks in restitution*, based on unjust enrichment, against a third party, retention of the benefit by the third party will not be unjust.

*Id.* at 328-29 (emphasis added).

Inspired attempts to distinguish *Clark Building* from the instant case and argues its holding is inapplicable because "Inspired is not seeking the same recovery in restitution as it seeks in its breach of contract claim against Worldwide." (ECF No. 81 at 11). Inspired points to the fact that in *Clark Building*, the owner sought the value of the unpaid rent for the same three month period from both the tenant and the building occupants, and attempts to contrast its own unjust enrichment claims from those in *Clark Building*: "Here, Plaintiff is seeking damages based on the cost to complete the project in excess of the contract sum from Worldwide in its breach of contract claim. Separately, Plaintiff is seeking to recover $100,000.00 of the $400,432.00 it paid Worldwide via

its unjust enrichment claim against Belcher Jr." *Id.* Thus, Inspired argues, because the measure of damages in a construction breach of contract claim is the cost of completion, it is not otherwise entitled to recover any portion of the amounts paid to Worldwide, and may therefore do so under a theory of unjust enrichment against Belcher Jr. *Id.*

Inspired cites no authority for this proposition, and the Court is not persuaded that *Clark Building* permits a loophole of this kind. *Clark Building* is clear that, where a plaintiff has a viable breach of contract remedy against a contracting party, they may not pursue an unjust enrichment claim against a third party for the same injury. 249 Md. App. at 328-29. While Inspired is correct that a recovery of the portion of the funds it paid to Worldwide is technically distinct from the cost of completion, that does not mean that it may pursue both theories of recovery. The cost of completion suffices to address any damages suffered from a breach of the contract, and permitting Inspired to simultaneously recover under an unjust enrichment theory would, in essence, allow for a double recovery, which is generally impermissible. *Id.*; s*ee also AXE Properties & Mgmt., LLC v. Merriman*, 261 Md. App. 1, 8 (2024) ("We hold that although a plaintiff may *allege* causes of action for breach of contract and unjust enrichment concurrently when there is evidence of fraud or bad faith, a plaintiff may not *recover* under both for any claim covered by the contract.") (emphasis in original) (citing *Dashiell*, 358 Md. at 100); Restatement (First) of Contracts § 346 (Am. Law Inst. 1932) ("The purpose of money damages is to put the injured party in as good a position as that in which full performance would have put him.").  The same reasoning applies to bar Inspired's unjust enrichment claim against Sunny Acres, as this claim is also predicated on funds Inspired paid to Worldwide under the contract which were then transferred by Worldwide to Sunny Acres. Thus, the Court finds that Inspired's unjust enrichment claims against Sunny

Acres and Belcher Jr. are barred as a matter of law under *Clark Building*, and will grant summary judgment in favor of Sunny Acres and Belcher Jr. on those claims.

### d.  <u>Worldwide Abandoned its Counterclaim</u>

Finally, Inspired contends Worldwide abandoned its counterclaim for breach of contract. Worldwide asserted its counterclaim in its answer to Inspired's original complaint, but omitted it when answering Inspired's amended complaint. (ECF No. 21; ECF No. 53). Inspired relies solely on *Ground Zero Museum Workshop v. Wilson* in support of its position, a case in which U.S. District Judge Deborah K. Chasanow of this court ultimately determined that a defendant had not abandoned his counterclaim despite omitting it from its response to an amended complaint. 813 F. Supp. 2d 678, 705-06 (D. Md. 2011). Judge Chasanow explained there is no clear consensus regarding whether failing to reassert a counterclaim when responding to an amended complaint results in abandonment of that claim. *Id.* at 705 ("Several courts have held that failure to reassert counterclaims in response to an amended complaint does not waive the counterclaims or otherwise affect their viability…Other courts have reached the opposite conclusion and deemed the counterclaims waived.") (collecting cases) (internal citations omitted).

Judge Chasanow ultimately held the defendant had not waived his counterclaim because he had "otherwise manifested his intent to pursue the counterclaims throughout the case history[.]" *Id.* at 706. Specifically, the *Ground Zero* defendant moved for leave to amend the counterclaims only two days after filing his answer, and his counterclaims, "thus, were indisputably at issue for the majority of the discovery period[.]" *Id.* at 705. Inspired distinguishes Worldwide's conduct from that of the *Ground Zero* defendant, arguing that because Worldwide did not move for leave to amend its counterclaim and has otherwise "taken no action indicating an intent to prosecute its

counterclaim[,]" the Court should find Worldwide has waived its right to pursue its breach of contract counterclaim.

The Court's review of case law post-*Ground Zero* is similarly inconclusive on this issue. *See, e.g.*, *Fenzel v. Group 2 Software, LLC*, No. DKC 13-0379, 2016 WL 865363, at *19 n.3 (D. Md. Mar. 7, 2016) (explaining "[t]he Federal Rules of Civil Procedure do not plainly resolve the question [of] whether the failure to reassert a counterclaim in an answer to an amended complaint constitutes an abandonment of a previously asserted counterclaim" and noting there is no consensus in case law) (citing *Ground Zero*, 813 F. Supp. 2d at 705-06); *Davis v. White*, 794 F. 3d 1008, 1015 (8th Cir. 2015) ("In our view, the Federal Rules of Civil Procedure clearly give a district court discretion to grant or deny a motion to deem a counterclaim abandoned[.]"). In any case, the undersigned need not make a determination on this question, because in addition to omitting its counterclaim from its answer to Inspired's amended complaint, Worldwide did not respond to Inspired's argument that its counterclaim was abandoned in its opposition to Inspired's Motion for Summary Judgment. In doing do, Worldwide has definitively abandoned its counterclaim. *Rodgers v. Eagle Alliance*, 586 F. Supp. 3d 398, 448-49 (D. Md. 2022) ("A plaintiff who fails to respond to an argument for summary judgment is deemed to have abandoned the claim.") (citations omitted). Thus, Worldwide's counterclaim for breach of contract against Inspired shall be considered abandoned and dismissed as a matter of law.

## IV.    CONCLUSION

For the reasons stated, it is this 27th day of May, hereby ordered:

1) Plaintiff's Motion for Summary Judgment (ECF No. 77) is GRANTED in part and DENIED in part;

2) Plaintiff's Motion for Summary Judgment is GRANTED to the extent is based on relief for Worldwide's breach of contract for failing to complete the curbing of the soccer field;

3) Plaintiff is awarded damages in the amount of $26,426.40, to be paid by Defendant Worldwide;

4) Defendant Worldwide's counterclaim for breach of contract against Inspired is dismissed;

5) The remainder of Plaintiff's Motion for Summary Judgment is DENIED; and

6) The Cross-Motion for Summary Judgment filed by Defendants Sunny Acres and Belcher Jr., (ECF No. 80), is GRANTED.

Dated: May 27, 2025

_____/s/_____
J. Mark Coulson
United States Magistrate Judge